UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNETTE NASH,<br><br>                     Plaintiff,<br><br>        -v-<br><br>HOME GOODS, INC.,<br><br>                     Defendant. | Civil Action No. 16-CV-1043(SLT)(VMS)<br><br>**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF <u>UNDISPUTED FACTS</u>** |

Defendant Home Goods, Inc. ("Defendant" or "Home Goods") submits that the following are undisputed material facts, pursuant to Rule 56.1 of the Local Rules of this Court:

**A.    BACKGROUND ON HOME GOODS, INC.**

    1.    Home Goods is a national retail chain and a division of TJX Corporation, with locations in and around the New York City metro area. (October 3, 2017 Deposition Transcript of Gail Parker ("Parker Dep."), 6:17-7:2, attached to the Declaration of Craig R. Benson as Ex. B).

    2.    The company employs an extremely diverse workforce and is committed to providing all of its employees with a workplace free of unlawful discrimination, harassment, and retaliation. (TJX Global Code of Conduct, D00055, attached to the Declaration of Craig R. Benson as Ex. F).

    3.    Toward that end, Home Goods maintains several policies which support and encourage a productive workplace environment. (*Id.*).

    4.    Among these workplace policies are policies prohibiting discrimination, harassment, and retaliation. (*Id.*). These policies include a procedure for reporting any violations of the policies. (*Id.*).

5.  All Home Goods employees received training on Home Goods anti-discrimination and anti-harassment policies. (*Id.*). In addition to these policies, store management also receives training on policies regarding the Americans with Disabilities Act. (*Id.*).

6.  These policies were in effect throughout Plaintiff's employment. (*Id.*).

7.  Home Goods also maintains policies regarding an employee Leave of Absence, and the applicable procedures for obtaining and returning from a Leave of Absence. (*Id.*).

8.  Plaintiff knew of each of these policies and procedures. (June 29, 2017 Deposition Transcript of Plaintiff Annette Nash ("Pl. Dep."), 160:11-161:12, attached to the Declaration of Craig R. Benson as Ex. A).

**B.   HOME GOODS STORE LAYOUT**

9.  In addition to workplace policies to support a productive environment, Home Goods also utilizes a certain layout for effectiveness and efficiency. (October 29, 2017 Deposition Transcript of James Rinaldo ("Rinaldo Dep."), 9, attached to the Declaration of Craig R. Benson as Ex. C).

10. Generally, Home Goods stores consist of four main areas, specifically, the sales floor, the receiving area, the break room, and the office. (*Id.*).

11. The sales floor is the area where merchandise is sold to customers. (*Id.*). This space includes the store entrance and cash registers, all of which are located at the front of the store. (*Id.*).

12. The receiving area, located at the back of the store, is where inventory is delivered, and team members unload and later stock the items on store shelves on the sales floor. (Pl. Dep. 58-59).

13. The break room is where team members take breaks. This space is shared by any team members on a break. (Pl. Dep. 145:12-19).

14. The office is a shared space used by assistant store managers ("ASM") and the store manager. The office space opens to the sales floor. (October 18, 2017 Deposition Transcript of Jerry Finkelstein ("Finkelstein Dep."), 65:25-66:25, attached to the Declaration of Craig R. Benson as Ex. D).

15. The sales floor is organized into various departments, and team members are expected to be familiar with and function in each department as needed. (Pl. Dep. 60:12-19).

### C. HOME GOODS TEAMS

16. Home Goods teams consist of merchandise associates, coordinators, and store management. (Parker Dep. 30-32).

17. The key responsibilities for merchandise associates included: receiving merchandise; organizing merchandise on sales floors according to company standards; stocking shelves and marking prices on merchandise; recovering merchandise; processing merchandise sale transactions; collaborating with other team members; and providing customer service. (Parker Dep. 30-32; Pl. Dep. 58:4-60:10).

18. Home Goods coordinators have all of the same responsibilities as a merchandise associate. (Parker Dep. 30-32; Pl. Dep. 58:4-60:10).

19. A key distinction between a merchandise associate and a coordinator is that the merchandise associate position is always part-time, meaning that the merchandise associate works between four (4) and twenty-nine (29) hours weekly. (*Id.*).

20. Conversely, coordinators positions require open availability, eight-hour shifts, and can be scheduled to work more than twenty-nine (29) hours weekly. (*Id.*).

21. The only other positions on Home Goods teams are store managers and ASMs. (*Id.*). These are the only positions with supervisory authority. (*Id.*).

22. Store management is supported by regional human resources teams. The regional human resources team partners with store management to administer and maintain employee files, manage associate relations issues, and address any performance concerns. (December 6, 2017 Deposition Transcript of Jessica Puerta ("Puerta Dep."), 6-10, attached to the Declaration of Craig R. Benson as Ex. E).

23. Store teams in Home Goods Mid-Atlantic region are supported by Gail Parker, Regional Manager of Human Resources, and Jessica Puerta, HR Generalist. (Parker Dep. 10, 14).

D.   **PLAINTIFF JOINS HOME GOODS STORE 242**

24. In 2011, Plaintiff applied for a merchandise associate position at Home Goods Store 242 in Staten Island, New York, which is located in Home Goods' Mid-Atlantic region. (Pl. Dep. 61:4-13; Parker Dep. 10).

25. When Plaintiff applied, she advised that her availability was 20-24 hours per week. (Pl. Dep. 61:4-13). This availability was sufficient for a merchandise associate position as this position is always part-time. (Parker Dep. 32:7).

26. On September 30, 2011, Home Goods hired Plaintiff as a merchandise associate at Store 242. (Pl. Dep. 55:13-20).

27. Plaintiff worked at Store 242 until her termination on June 15, 2016. (Benson Decl., Ex. L).

4

28. Throughout her employment with Home Goods, Plaintiff never worked more than 24 hours in a given week, and never advised of any changes in her availability. (Pl. Dep. 172:19-173:21)

29. In fact, Plaintiff advised that twenty-four (24) hours was the maximum amount of hours she could work in a given week. (*Id.*).

30. When Plaintiff began working at Store 242, her store manager was James ("Jim") Rinaldo until he transferred to another store in October 2015. (Puerta Dep. 26:3-5). Upon Rinaldo's transfer, Jerry Finkelstein became Plaintiff's store manager. (*Id.*).

31. Throughout her employment, Plaintiff's ASMs were Kevin Carter, Tori Mazzola, Kathy Lisi, and Maureen Russo. (Rinaldo Dep. 10:8-24).

32. Plaintiff reported directly to the store manager and whichever ASM was assigned during her shift. (Parker Dep. 30-32).

E. **PLAINTIFF'S JOB PERFORMANCE**

33. As a merchandise associate, Plaintiff received an annual employee evaluation. (Benson Decl., Ex. H, I). During the last three years of her employment with Home Goods, Plaintiff received a rating of "3 – Meets Expectations" from then store manager, Mr. Rinaldo. (*Id.*).

34. Plaintiff's satisfactory performance resulted in annual raises. She began her employment with an hourly rate of $7.25, and by 2015, had an increased hourly rate of $9.63. (*Id.*).

35. However, Plaintiff had continuing issues involving her interactions with other team members. (Parker Dep. 23:14-18).

36. On her 2014 evaluation, these issues in interacting with other team members were addressed. (Benson Decl., Ex. H, I). Specifically, she received comments that she "still need[ed] to respect the members of management and the decision[s] they make [in] the store." (Benson Decl., Ex. H).

37. Plaintiff's 2015 evaluation contained the following: "Annette you have made improvements in this area. You still need to respect the members of management and the business they may need to take [sic] during a course of a week for various reasons. You also have [sic] continue to be mindful of your fellow co workers [sic] and how you may speak to them can come across as [b]ossy at time [sic] and realize that you are peers. You must give respect to get that respect in return." (Benson Decl., Ex. I).

38. Plaintiff reviewed and signed each of these evaluations, and thus was aware of the performance expectations. (Benson Decl., Ex. H, I).

**F. PLAINTIFF FILES A CHARGE WITH THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

39. On May 6, 2015, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Benson Decl., Ex. M). She alleged the following: gender, religious, and disability discrimination; harassment; retaliation; failure to provide reasonable accommodations, failure to promote, and unequal pay. (*Id.*).

40. Notably, Home Goods only learned of Plaintiff's alleged disability through her EEOC Charge. (*Id.*). It was not until in or around August 2015, when Plaintiff informed Gail Parker, Regional Manager of Human Resources, that she gets overwhelmed if she works more than 24 hours per week. (Pl. Dep. 61:4-18).

**G.    INCIDENT ON OCTOBER 23, 2015 AND PLAINTIFF'S FIRST CORRECTIVE ACTION**

41.    As part of its policies that serve to maintain a work environment free from discrimination, harassment, and retaliation, Home Goods requires that employees collaborate respectfully at all times. (Benson Decl., Ex. F).

42.    If an employee engages in conduct inconsistent with these policies, such employee is subject to corrective action, up to and including termination. (*Id.*).

43.    On October 23, 2015, Plaintiff engaged in conduct that resulted in her first Corrective Action. (Benson Decl., Ex. J).

44.    As part of a celebration honoring the outgoing store manager, there was pizza available in the break room for team members. (Pl. Dep. 134:20–136:1).

45.    Plaintiff brought pizza and soda, out of the break room, to the merchandise associates working in the receiving area. A coordinator, LoriAnn Lezzo, told Plaintiff that associates were not supposed to bring food to the receiving area. (Pl. Dep. 135–136).

46.    Displeased with Ms. Lezzo's statement to her, Plaintiff initiated a verbal altercation with Ms. Lezzo. (Pl. Dep. 150:17-151:3).

47.    Specifically, Plaintiff raised her voice, used profanity, and repeatedly banged a cup on the table. (Pl. Dep. 150:17-151:3; 153:16-18; 155:5-14).

48.    Plaintiff continued to engage in loud and disruptive behavior even after management asked that she stop. (Benson Decl., Ex. J).

49.    In or around late October 2015, Plaintiff informed Jerry Finkelstein, the new store manager, about the incident. (Finkelstein Dep. 7:22-10:18). Finkelstein had not yet joined the store when the incident occurred and consequently had not witnessed the incident. (*Id.*).

Human Resources directed Mr. Finkelstein, to conduct an investigation by obtaining Associate Relations Statements. (*Id.*).

50. Jerry Finkelstein began his investigation by obtaining a statement from Plaintiff, and thereafter, obtained statements from each team member Plaintiff named as having had a role in the incident. (*Id.*).

51. At the conclusion of his investigation, Finkelstein determined that Plaintiff had engaged in inappropriate conduct by using profanity and raising her voice at her colleagues. (Benson Decl., Ex. J). At the recommendation of Human Resources, Finkelstein issued a Corrective Action on November 25, 2015 ("First Corrective Action"). (*Id.*).

52. The First Corrective Action stated that Plaintiff "yelled at other associates and used profanity in the break room," and "continued to engage in this loud, disruptive behavior even after management asked [her] to stop." (*Id.*).

53. The First Corrective Action also warned the Plaintiff that she should: "refrain from using profanity in the workplace," "refrain from yelling at associates in the workplace," "maintain professionalism," "treat fellow associates in a respectful manner," and "seek assistance from members of management if [she has] a disagreement with a customer or fellow associates rather than escalate conflicts." (*Id.*).

54. The Action Plan outlined in the First Corrective Action required that Plaintiff "reread the company's associate relations policy, sign the field associates orientation checklist, reread the global code of conduct and sign the TJX code of conduct acknowledgement form." (*Id.*).

55. Plaintiff did not do any of the actions outlined in the Action Plan. (Pl. Dep. 157:19–158:2).

**H.    THE EEOC DISMISSES PLAINTIFF'S CHARGE AGAINST HOME GOODS**

56.    On December 11, 2015, the EEOC determined that there was no violation of Plaintiff's rights and accordingly, dismissed her charge against Home Goods and issued a Notice of Right to Sue letter. (Benson Decl., Ex. Q).

**I.    INCIDENT ON DECEMBER 26, 2015 AND PLAINTIFF'S SECOND CORRECTIVE ACTION**

57.    On December 26, 2015, Plaintiff engaged in conduct that resulted in her Second Corrective Action. (Benson Decl., Ex. K).

58.    During a shift on December 26, 2015, a team member asked Plaintiff to retrieve the price on an item. (Finkelstein. Dep. 19:19-25).

59.    Plaintiff refused to retrieve the price, insisted that a manager should retrieve the price because it was not her responsibility, and ended up in yet another verbal altercation with the team member during which she raised her voice at the team member. (Finkelstein. Dep. 18:20-25). This incident happened on the sales floor in front of several customers. (*Id.*). Finkelstein attempted to deescalate the situation, but Plaintiff resisted and was walked off the sales floor. (Finkelstein. Dep. 19:1-13).

60.    On December 30, 2015, Finkelstein issued Plaintiff a Second Corrective Action reiterating the same expectations and Action Plan outlined in the First Corrective Action. (Benson Decl., Ex. K).

61.    The Second Corrective Action stated that "[Plaintiff] yelled at another Associate on the sales floor in front of other Associates as well as customers," and "continued to engage in this loud and disruptive behavior until [she was] asked to leave the sales floor by the store manager." (*Id.*).

9

62. Finkelstein also advised Plaintiff that another violation could result in termination. (Pl. Dep. 195:5-11). The Second Corrective Action expressly stated that a "[f]urther occurrence of [inappropriate conduct] or any other violation of Company policies and procedures could lead [to] termination." (Benson Decl., Ex. K).

63. It further provided the following: "All Associates are expected: to refrain from yelling at Associates at the workplace, to maintain professionalism, [to] treat fellow Associates in a respectful manner, [to] seek assistance from members of management if [there is] a disagreement with a customer or fellow Associate, rather than escalate conflicts." (*Id.*).

64. The Action Plan outlined in the Second Corrective Action required that Plaintiff "[r]e-read the Company's Associate Relations Policy, Orientation Checklist, and the Global Code of Conduct by 1/8/16." (*Id.*).

65. Again, Plaintiff did not do any of the actions outlined in the Action Plan. (Pl. Dep. 196:9-16).

**J.     HOME GOODS ENGAGES PLAINTIFF IN THE INTERACTIVE PROCESS**

66. On December 31, 2015, the day after Plaintiff received the Second Corrective Action, Plaintiff requested a leave of absence under the Family Medical Leave Act ("FMLA"). (Pl. Dep. 207:1-8).

67. Plaintiff had not worked enough hours to meet the FMLA's 1250 hour requirement of number of hours worked in order to be eligible for FMLA leave. (Benson Decl., Ex. N). Consequently, the Company denied Plaintiff's FMLA leave request on January 4, 2016 in compliance with FMLA requirements. (*Id.*).

68. Prior to Plaintiff's request for FMLA leave, Home Goods was not aware of the nature of Plaintiff's alleged disability, only that she had alleged she had an unspecified disability in her EEOC charge. (Parker Dep. 15:20-16:16).

69. In order to ascertain the nature of the disability, Home Goods began the interactive process with her to try to determine whether she required any reasonable accommodation. (*Id.*).

70. Gail Parker, Regional Manager of Human Resources, visited Store 242, in-person, specifically to meet with Plaintiff, provide her with a Reasonable Accommodation Medical Inquiry Form, and assist her with completing it. (*Id.*).

71. Plaintiff was pleased with the support from Human Resources. (Pl. Dep. 287:17-22).

72. Plaintiff's medical provider, Neil Nepola, M.D. completed and returned the Reasonable Accommodation Medical Inquiry Form to Gail Parker on January 21, 2016. (Benson Decl., Ex. O). Dr. Nepola stated that Plaintiff "suffered from PTSD, low back pain, depression and anxiety, and required a decreased work schedule and restriction on lifting heavier objects." (*Id.*).

73. On February 10, 2016, Ms. Parker faxed a letter to Dr. Nepola requesting the specifics on the number of hours Plaintiff could work and the weight limit for her lifting restriction. (Parker Dep. 20:7-13).

74. After two follow-up calls, Ms. Parker received a response to her letter which was a copy of her original letter to Dr. Nepola with handwritten notes in writing that matched Plaintiff's. (*Id.*). The handwritten notes contained the following restrictions: Plaintiff could not

11

lift more than twenty pounds or work more than 22-24 hours per week, and required a break every 5-6 hours. (Benson Decl., Ex. P).

75. As a merchandise associate, a position which is always part-time at Home Goods, Plaintiff's working conditions already satisfied these criteria. (Parker Dep. 32:5-7). Yet, Home Goods nonetheless "granted" Plaintiff's request, despite the suspicious format of the response to Ms. Parker's letter.

76. Home Goods continuously and appropriately engaged in the interactive process with Plaintiff and properly administered Plaintiff's leave requests. (Parker Dep. 27:4-10).

**K.  MAY 19, 2016 INCIDENT RESULTS IN PLAINTIFF'S THIRD CORRECTIVE ACTION AND TERMINATION**

77. On May 19, 2016, Plaintiff engaged in conduct that resulted in her Third Corrective Action and termination. (Benson Decl., Ex. L).

78. The incident on May 19, 2016 originated with a leave request Plaintiff submitted in early May 2016.  (Pl. Dep. 209:18–210:8).

79. On May 9, 2016, Plaintiff called out sick from work for that day and for the remainder of that work week. (Pl. Dep. 216:5-217:6). Plaintiff also requested a leave of absence for two weeks through HR XPRESS, a department that assists the regional human resources team with administering leaves and leave requests. (*Id.*).

80. Plaintiff's request for leave was eventually denied because her doctor did not submit the requisite paperwork. (Puerta Dep. 43:17-22). Prior to this eventual decision, however, Human Resources (believing that the leave would eventually be granted) notified Store 242 that Plaintiff would be on a leave of absence and should not be scheduled to work. (*Id.*). Consequently, Plaintiff was coded in Store 242's system as being on a leave of absence during the weeks she requested. (*Id.*).

81.     At Home Goods, shift schedules are generated at least one week prior to the work week. (Finkelstein Dep. 38:23-25). Team members are scheduled based on store needs as well as team members' availability. (Finkelstein Dep. 39:5-8).

82.     Additionally, team members on leaves of absence are coded accordingly in the store system. (Pl. Dep. 229:6-11). The system prevents team members on leaves from being added to the shift schedule or clocking in for a shift. (*Id.*).

83.     While shift schedules are generated by store management, store management has no involvement in team members' coding for leaves of absence. (Finkelstein Dep. 38:25-39:4; 40:6-19). Coding for leaves of absence is controlled solely by human resources and its supporting departments. (*Id.*).

84.     On May 18, 2016, Plaintiff unexpectedly arrived at Store 242, expecting to work a shift. (Finkelstein Dep. 38:12-19). However, given Plaintiff's leave request, she was coded in the store system as being on a leave of absence, and thus was not on the shift schedule or able to clock-in. ((Puerta Dep. 43:17-22); Pl. Dep. 229:6-9).

85.     Plaintiff contacted the Benefits Department in the presence of ASM Tori Mazzola, and confirmed that she was not, in fact, on leave status. (Pl. Dep. 228:24-229:3).

86.     After the discussion with the Benefits Department, the Department recoded Plaintiff in Store 242's system, and she was then able to clock-in and begin work. (Pl. Dep. 229:12-15).

87.     On May 19, 2016, Plaintiff again arrived for work and went to the office to request her schedule for the remainder of the week. (Finkelstein Dep. 38:16-19).

88.     Finkelstein, who did not work on May 18, 2016 and thus was unaware of the conversations that had transpired regarding Plaintiff's leave, explained to Plaintiff that he did

13

not have the available hours to place her on the schedule for that week, because at the time he made the schedule she was coded as being on leave. (Finkelstein Dep. 38:12-19).

89. In response, Plaintiff inappropriately raised her voice at Finkelstein. (Pl. Dep. 236:24–237:17). Plaintiff "yelled at [Finkelstein], refusing to let him explain," and "demand[ed] to be placed on the schedule [while] pointing [her] finger at him aggressively." (Benson Decl., Ex. L).

90. Two ASMs, Tori Mazzola and Kathy Lisi, witnessed Plaintiff raising her voice at Finkelstein. (Pl. Dep. 260:9-16).

91. Finkelstein was ultimately able to explain to Plaintiff that he could offer her one day on the schedule and that she would be paid for working on May 18 and May 19, but that the schedule was otherwise full through the end of the next week. (Finkelstein Dep. 39:11-14).

92. As a result of Plaintiff's insubordinate and inappropriate conduct, Plaintiff incurred a Third Corrective Action which was grounds for termination. (Benson Decl., Ex. L).

93. However, Finkelstein could not deliver the Third Corrective Action or the termination immediately. (Pl. Dep. 224:1-10). Although Plaintiff had been insisting on May 19, 2016 that she be scheduled for at least 22 hours the following week, on May 20, 2016, Plaintiff contacted HR XPRESS to request FMLA leave starting the previous day, May 19, 2016. (*Id.*).

94. Home Goods approved Plaintiff's leave request, and thus her employment as a merchandise associate was not terminated until she returned from leave on June 15, 2016. (Pl. Dep. 224:19-225:22).

95. Finkelstein delivered the Third Corrective Action to Plaintiff and terminated her employment when she arrived to work on June 15, 2016. (*Id.*). The Corrective Action and termination stated:

14

> "On 5/19/16, you acted in a combative and insubordinate manner toward your Store Manager when he was trying to explain that store management had not placed you on the schedule that week because they understood that you were on a medical leave of absence. You yelled at the Store Manager, refusing to let him explain, raising your voice, demanding to be placed on the schedule, and pointing your finger at him aggressively. . . This conduct falls outside of the Company's expectation that all Associates refrain from Improper Behavior and treat each other with respect."

(Benson Decl., Ex. L).

96.     Under the Action Plan, the Third Corrective Action further states:

"Due to this conduct and [Plaintiff's] prior Corrective Actions for Improper Behavior, [Plaintiff's] employment will be terminated on June 13, 2015 consistent with the Company's Corrective Action Policy."

(*Id.*).

97.     Jessica Puerta, HR Generalist on the regional human resources team attended the termination discussion by phone, and ASM Tori Mazzola attended in-person. (*Id.*; Finkelstein Dep. 63:17-25).

**L.    THERE IS NO CREDIBLE EVIDENCE TO SUPPORT PLAINTIFF'S CLAIMS**

98.     At her deposition, Plaintiff acknowledged that she was issued three corrective actions for engaging inappropriate conduct. (Pl. Dep. 148:22-24; 204:21-23).

99.     Specifically, Plaintiff acknowledged that she raised her voice and used inappropriate language in her interactions with team members. (Pl. Dep. 145:6-9; 189:15-19; 237:1-9).

15

100. Plaintiff could not identify a single discriminatory comment about her religion during discovery. (Pl. Dep. 326:1–328:5).

101. Home Goods ended any disputes regarding the music playing in the break room by removing the radio in the break room well before Plaintiff engaged in protected activity.

102. Plaintiff did not identify a single discriminatory comment about her gender, or purported differences in pay based solely on her gender during discovery. (Pl. Dep. 45:17-24).

103. During discovery, Plaintiff did not identify any instance where her requests for accommodation went unaddressed. (Pl. Dep. 350:18-351:1). Rather, Plaintiff testified that she always received her breaks and she was never scheduled for more than 24 hours in any given week or required to lift more than twenty pounds. (Pl. Dep. 246:21-23). Consequently, Plaintiff concedes that she received the reasonable accommodations she requested. (*Id.*).

Date: January 12, 2018
New York, New York

*s/ Craig R. Benson*
Craig R. Benson
Jennifer L. Taiwo
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Defendant*

16