UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

ANNETTE NASH,

          Plaintiff,

   - against -

HOMEGOODS, INC.,

          Defendant.

------------------------------------------------------------

**MEMORANDUM AND ORDER**

16-cv-1043 (AMD) (VMS)

**ANN M. DONNELLY, District Judge.**

The plaintiff, a former HomeGoods, Inc., employee, brings this action against HomeGoods, Inc., alleging discriminatory treatment and retaliation on the basis of disability.[1] Specifically, the plaintiff alleges: (1) disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), and (2) retaliation in violation of the ADA. (Compl. at 1-3, ECF No. 1.) The defendant moved for summary judgment, and the plaintiff opposed. The defendant also moved to strike a third-party witness declaration and portions of the plaintiff's Rule 56.1 Counterstatement. For the reasons that follow, the defendant's motion for summary judgment is granted in part and denied in part, and the motion to strike is denied.

----

[1] The complaint also alleged an Equal Pay Act claim, and ADA and Title VII claims for discrimination on the basis of gender/sex and religion, failure to accommodate, harassment, and failure to promote, but the plaintiff has since dropped those claims. (*See* ECF No. 56 at 10; ECF No. 1 at 1-3.) The plaintiff argues that the complaint also asserted New York City Human Rights Law claims for retaliation and discrimination arising from the termination of her employment, and discrimination arising from being treated worse than non-disabled employees, but the vague reference to "New York law" under the jurisdictional section of the complaint is insufficient to plead the NYCHRL claims. (*See* ECF No. 1 at 2.)

# BACKGROUND

## 1. Facts

The plaintiff suffers from post-traumatic stress disorder, depression, and anxiety. This case arises out of the defendant's termination of her employment, which the plaintiff alleges was connected to her disability.

HomeGoods is a national retail chain with locations around the New York City area. (Plaintiff's Rule 56.1 Counter-Statement ("Pl.'s 56.1") ¶ 1, ECF No. 54.) HomeGoods' employees include merchandise associates,[2] coordinators,[3] and store management.[4] (*Id.* ¶ 16.) Store management is supported by regional human resources teams, who assist store management with administering and maintaining employee files, managing relations issues, and addressing performance concerns. (*Id.* ¶ 22.)

The Staten Island HomeGoods store (Store 242) is in the company's Mid-Atlantic region. (*Id.* ¶ 24.) Gail Parker is the Regional Manager of Human Resources, and Jessica Puerta is the Human Resources Generalist. (*Id.* ¶ 23.)

The Staten Island store was divided into four main areas: the sales floor, the receiving area, the break room, and the office. (*Id.* ¶¶ 10-14.) Merchandise is sold on the sales floor at the front of the store, where the store entrance and cash registers are located. (*Id.* ¶ 11.) The receiving area is in the back of the store; inventory is delivered there, and employees unload and stock the items on store shelves on the sales floor. (*Id.* ¶ 12.) Employees share the break room. (*Id.* ¶ 13.) The office, which

---

[2] Merchandise associates have the following key responsibilities: receiving merchandise, organizing merchandise on the sales floor in accordance with company standards, stocking shelves, marking prices on merchandise, recovering merchandise, processing merchandise sale transactions, collaborating with other employees, and providing customer service. (Pl.'s 56.1 ¶ 17.)

[3] Coordinators have the same responsibilities as merchandise associates, but associates are always part time. (Pl.'s 56.1 ¶¶ 18-19.) The coordinator position requires open availability and eight-hour shifts, and coordinators can be scheduled to work more than 29 hours a week. (Pl.'s 56.1 ¶ 20.)

[4] Store managers and assistant store managers are the only employees with supervisory authority. (Pl.'s 56.1 ¶ 21.)

opens to the sales floor, is a shared space used by the store manager and assistant store managers. (*Id.* ¶ 14.)

In 2011, the plaintiff applied for a merchandise associate position at the Staten Island store. (*Id.* ¶ 24.) She was available to work from 20 to 24 hours a week, making her eligible for a position as a part-time merchandise associate. (*Id.* ¶ 25.) HomeGoods hired the plaintiff as a merchandise associate on September 30, 2011. (*Id.* ¶ 26.) The plaintiff worked at the Staten Island store until she was terminated on June 15, 2016. (*Id.* ¶ 27.)

James Rinaldo was a store manager at the Staten Island HomeGoods store until Jerry Finkelstein replaced him in October of 2015. (*Id.* ¶ 30.) Kevin Carter, Victoria "Tori" Mazzola, Kathy Lisi, and Maureen Russo were assistant store managers at the Staten Island store at various points during the plaintiff's employment. (*Id.* ¶ 31.) The plaintiff reported directly to the store manager and assistant store manager during her shift. (*Id.* ¶ 32.)

The plaintiff received an annual employee evaluation. (*Id.* ¶ 33.) Rinaldo gave her a "3 – Meets Expectations" rating in each of the last three years of her employment at the store. (*Id.*) In her 2014 evaluation, Rinaldo commented that the plaintiff "still need[ed] to respect the members of management and the decision[s] they make [in] the store." (*Id.* ¶ 36.)

In 2015, Rinaldo made the following comments:

- "Annette you have made improvements in this area [policies and procedures]. You still need to respect the members of management and the business they may need to take [sic] during a course of a week for various reasons. You also have [sic] continue to be mindful of your fellow co workers [sic] and how you may speak to them can come across as [b]ossy at time[s] and realize that you are peers. You must give respect to get that respect in return." (*Id.* ¶ 37.)
- "You give outstanding customer service and enjoy doing it." (*Id.* ¶ 37; Benson Decl., Ex. I.)
- "Annette you communicate well of [sic] what was done for the day or what projects you have asccompli[s]h[h]ed." (Pl.'s 56.1 ¶ 37; Benson Decl., Ex. I.)
- "Annette you love helping customers. You will go out of your way to help them and give advice to them on what they purchase." (Pl.'s 56.1 ¶ 37; Benson Decl., Ex. I.)

3

- "Your quality of the work you accomplish is good." (Pl.'s 56.1 ¶ 37; Benson Decl., Ex. I.)
- "Annette you do work from the time you walk in the building until the time you [leave] and will help out in any area of the store when needed." (Pl.'s 56.1 ¶ 37; Benson Decl., Ex. I.)

The plaintiff signed each of her evaluations. (Pl.'s 56.1 ¶ 38.)

A former employee, Barbara Thomas, claimed that loud arguments in the workplace were common, and that both managers and hourly workers regularly used profanity. (Pl.'s 56.1 ¶ 133; Thomas Decl. ¶ 4.) The plaintiff contends that other employees, including managers, called her "stupid" and made derogatory references to her disability and mental capacity. (Pl.'s 56.1 ¶ 134.) According to Gail Parker, the Regional Manager of Human Resources, the plaintiff "was unhappy with her coworkers" and complained about "multiple issues." (Parker Dep. 23:14-18; Pl.'s 56.1 ¶ 35.)

On May 6, 2015, the plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission. (Pl.'s 56.1 ¶ 39.) She alleged gender, religious, and disability discrimination, harassment, retaliation, failure to provide reasonable accommodations, failure to promote, and unequal pay. (*Id.*)

About six months after the plaintiff filed the EEOC charge, she received her first formal discipline, known as a Corrective Action, arising from an incident in connection with a pizza celebration for the outgoing store manager, James Rinaldo. (Pl.'s 56.1 ¶¶ 43-44.) The plaintiff brought pizza and soda from the break room to the merchandise associates working in the receiving area. (*Id.* ¶ 45.) A coordinator, LoriAnn Lezzo, told the plaintiff that associates were not supposed to bring food to the receiving area. (*Id.* ¶ 45.) According to the defendant, the plaintiff argued with Ms. Lezzo, raised her voice, used profanity, and repeatedly banged a cup on a table. (Defendant's Rule 56.1 Statement ("Def.'s 56.1") ¶¶ 46-47, ECF No. 47.) The plaintiff responds that Ms. Lezzo started the argument; the plaintiff claims that Ms. Lezzo yelled, "[W]here the f*** are you going with those pizzas?" (Pl.'s 56.1

4

¶ 46; Pl.'s Dep. 153:3-18.) The plaintiff denies that she used any profanity or yelled at other employees, although she concedes that she told Ms. Lezzo to "get the hell out" of the break room. (Pl.'s 56.1 ¶ 47; Pl.'s Dep. 153:3-18.) The plaintiff also admitted that she yelled at Ms. Lezzo and banged a cup on the table once or twice. (Pl.'s Dep. 145:6-9, 148:1-6, 150:17-20, 155:5-14.) The plaintiff attributes her behavior to a panic attack. (Pl.'s Dep. 135-39, 149-50.)

According to the plaintiff, the outgoing store manager, James Rinaldo, knew about the incident, did not think discipline was necessary, and considered the matter closed. (Pl.'s 56.1 ¶¶ 117-18.)

Jerry Finkelstein became store manager the next week. The plaintiff met with Finkelstein and told him about the pizza incident, her disability, and her EEOC claim. (*Id.* ¶ 49; ECF No. 57-1 at 7-8.) Although the previous manager had already determined that the pizza incident did not warrant any action, Finkelstein began an investigation; he got the plaintiff's statement and statements from each of the employees that the plaintiff identified. (Pl.'s 56.1 ¶ 50.)

According to the defendant, Finkelstein determined that the plaintiff had engaged in inappropriate conduct by using profanity and raising her voice at her colleagues, and at the recommendation of Human Resources, issued a Corrective Action on November 25, 2015. (*Id.* ¶ 51.) The plaintiff responds that at HomeGoods management, not Human Resources, is responsible for disciplining and terminating associates, a fact about which Gail Parker also testified. (*Id.* ¶ 51.)

In the Corrective Action report, Finkelstein wrote that the plaintiff "yelled at other associates and used profanity in the break room," and "continued to engage in this loud, disruptive behavior even after management asked [her] to stop." (*Id.* ¶ 52.) Finkelstein directed the plaintiff to "refrain from using profanity in the workplace," "refrain from yelling at associates in the workplace," "maintain professionalism," "treat fellow associates in a respectful manner," and "seek assistance from members of management if [she has] a disagreement with a customer or fellow associates rather than escalate

conflicts." (*Id.* ¶ 53.) The plaintiff concedes the content of the report, but disputes the description of her conduct; she refused to sign it because she thought it was false. (*Id.* ¶ 43; Pl.'s Dep. 135-36, 149-50.) According to the plaintiff and Barbara Thomas, the plaintiff never used inappropriate language; in fact, she frequently complained about others cursing at work. (Pl.'s 56.1 ¶ 99; Thomas Decl. ¶ 3.)

The report also included an Action Plan, which required the plaintiff to "reread the company's associate relations policy, sign the field associates orientation checklist, reread the global code of conduct and sign the TJX code of conduct acknowledgment form." (Pl.'s 56.1 ¶ 54.) The plaintiff did not do any of these things; she did not sign the forms because she had already signed them, and was already familiar with the policies. (*Id.* ¶ 55; Pl.'s Dep. 157:19-158:15, 160:7-161:12.)

In an email to a district manager, Finkelstein described his conversation with the plaintiff. (ECF No. 57-1 at 7-8.) He said that the plaintiff was crying, told him about her disability, said that she had filed the EEOC complaint, and was frustrated because management did not do anything about her complaints that other employees used foul language and were abusive to her. (*Id.*; *see also* Pl.'s 56.1 ¶¶ 113-14.) At two points in the email, Finkelstein noted that the plaintiff incorrectly abbreviated acronyms—"she told me she contacted H&R (as she refers to them instead of HR)," and "she mentioned she was told by L&P (LP)." (ECF No. 57-1 at 7-8; *see also* Pl.'s 56.1 ¶ 115.)

Both the plaintiff and Thomas allege that Jerry Finkelstein was verbally abusive, routinely belittled the plaintiff's mental capacity, and disparaged her disability. (Pl.'s 56.1 ¶ 111; Thomas Decl. ¶ 2.) Thomas alleges that Finkelstein once told the plaintiff that a "moron" was smarter than the plaintiff. (Thomas Decl. ¶ 2.)

On December 11, 2015, the EEOC dismissed the plaintiff's charge against HomeGoods because it was "unable to conclude that the information obtained establishes violations of the statutes." (Benson Decl., Ex. Q at 11.) The EEOC noted, however, that its decision was not a conclusion "that the

6

respondent is in compliance with the statutes." (*Id.*) It also issued a Notice of Right to Sue letter. (*Id.*; *see also* (Pl.'s 56.1 ¶ 56.)

About two weeks later, on December 26, 2015, the plaintiff was issued a second Corrective Action after a dispute with another employee. (Pl.'s 56.1 ¶ 57.) According to the defendant, the plaintiff refused the employee's request that the plaintiff get the price of an item, and insisted that it was the manager's job, not hers, to get the price. (*Id.* ¶¶ 58-59.) The plaintiff was yelling at the employee. (*Id.* ¶ 59.)

The plaintiff tells a slightly different story. She says that she was unpacking boxes in her area, and left to empty a dust pan. (*Id.*) A cashier asked her to retrieve a price, and the plaintiff responded that she had to get back to her area because customers might trip over the boxes. (*Id.*) The plaintiff says that she suggested that the employee ask another employee—Theresa—or the assistant manager, who were both nearby. (*Id.*) The plaintiff admitted that she raised her voice, but claims that she "wasn't loud" or "screaming at her or . . . yelling at her in front of customers." (Pl.'s Dep. 189:15-23, 204:12-14.)

On December 30, 2015, Finkelstein issued a second Corrective Action that reiterated the expectations and Action Plan in the first Corrective Action. (Pl.'s 56.1 ¶ 60.)

According to that report, the plaintiff "yelled at another Associate on the sales floor in front of other Associates as well as customers," and "continued to engage in this loud and disruptive behavior until [she was] asked to leave the sales floor by the store manager." (Benson Decl., Ex. K; Pl.'s 56.1 ¶ 61.) The plaintiff responds that the report was not accurate. (Pl.'s 56.1 ¶ 57.)

Finkelstein warned the plaintiff that she could be terminated if she got another violation, and the warning was included in the second Corrective Action report: "Further occurrence of [inappropriate conduct] or any other violation of Company policies and procedures could lead [to] termination."

(Benson Decl., Ex. K.; Pl.'s 56.1 ¶ 62.) It also provided that "[a]ll associates are expected: to refrain from yelling at Associates at the workplace, to maintain professionalism, [to] treat fellow Associates in a respectful manner, [to] seek assistance from members of management if [there is] a disagreement with a customer or fellow Associate, rather than escalate conflicts." (Benson Decl., Ex. K; Pl.'s 56.1 ¶ 63.)

The report contained an Action Plan requiring the plaintiff to "[r]e-read the Company's Associate Relations Policy, Orientation Checklist, and the Global Code of Conduct by 1/8/16." (Pl.'s 56.1 ¶ 64.) Once again, the plaintiff did not take any of the actions outlined in the Action Plan; she denies that she was told to re-read the company policies, and says that in any event she already had her own copies of the policies. (*Id.* ¶ 65; Pl.'s Dep. 196:9-16.)

On December 31, 2015, a day after the second Corrective Action, the plaintiff asked for a leave of absence under the Family Medical Leave Act. (Pl.'s 56.1 ¶ 66.) Because the plaintiff had not worked enough hours to meet the FMLA's 1250 hour eligibility requirement, HomeGoods denied her leave request on January 4, 2016, in compliance with FMLA requirements. (*Id.* ¶ 67.)

The defendant denies that it knew of the plaintiff's disability before the plaintiff asked for FMLA leave; it was aware only that she had alleged an unspecified disability in her EEOC complaint. (Def.'s 56.1 ¶ 68.) The plaintiff claims that her disabilities—PTSD, depression, and anxiety—are apparent to others, and known throughout the store. (Pl.'s 56.1 ¶¶ 106-07.) Barbara Thomas said it was "common knowledge" that the plaintiff had a mental/psychological disability; a group of employees at the store called the plaintiff "crazy" or "stupid." (*Id.* ¶ 110; Thomas Decl. ¶ 5.) The plaintiff also says that she told assistant store manager Kevin Carter about the nature of her disability shortly after he started working at the store. (Pl.'s 56.1 ¶ 68; *see also* Pl. Dep. 132-135.)

Gail Parker, the Human Resources Regional Manager, met with the plaintiff at the Staten Island store; she gave the plaintiff a Reasonable Accommodation Medical Inquiry Form, and helped her

complete the form. (Pl.'s 56.1 ¶ 70.) The plaintiff believed that Parker was supportive of her. (*Id.* ¶ 71.) The plaintiff's doctor filled out the form, and stated that the plaintiff "suffered from PTSD, low back pain, depression and anxiety, and required a decreased work schedule and restriction on lifting heavier objects." (*Id.* ¶ 72.) The defendant contends that it engaged in an "interactive process" with the plaintiff to address her requested accommodations. (*Id.* ¶¶ 73-76.)

The plaintiff filed this action against the defendant on February 22, 2016; she was not represented by counsel at that point.[5] (ECF No. 1.)

On May 19, 2016, the plaintiff was issued a third Corrective Action. (*Id.* ¶ 77.) The defendant and the plaintiff disagree about some aspects of the incident that led up to the complaint, but agree that it arose out of the plaintiff's request for leave, a scheduling snafu, and an argument between the plaintiff and Finkelstein in which the plaintiff raised her voice.

According to the defendant, on May 9, 2016, the plaintiff called HR XPRESS, a department that assists the regional human resources team with administering leaves and leave requests, said she was sick, and asked for a two week leave of absence. (*Id.* ¶ 79; *see also* ECF No. 57-1 at 16.) Human Resources notified the store that the plaintiff would be out and should not be scheduled to work; thus, the plaintiff was coded in the store's system as being on leave during the weeks she requested.[6] (Pl.'s 56.1 ¶ 80.) The plaintiff's leave request was ultimately denied because her doctor did not submit the necessary paperwork. (*Id.*)

On May 18, 2016, the plaintiff came to the store expecting to work a shift. (Def.'s 56.1 ¶ 84.) Because she had asked for leave, she was coded in the system as being on leave, and was not on the

_____

[5] The plaintiff retained counsel on July 13, 2016, after she was fired. (ECF No. 18.)

[6] The parties agree that HomeGoods generates shift schedules at least a week in advance, and employees are scheduled based on store needs and employees' availability. (Pl.'s 56.1 ¶ 81.) HomeGoods' computer system prevents scheduling associates who are on leave. (*Id.* ¶ 82.) Although store management generates shift schedules, Human Resources and its supporting departments control employees' coding for leaves of absence. (*Id.* ¶ 83.)

schedule or able to clock in. (*Id.*) The plaintiff contacted the Benefits Department with assistant store manager Tori Mazzola, and confirmed that she was not on leave status. (*Id.* ¶ 85; *see also* ECF No. 57-7 at 16.) The Benefits Department recoded the plaintiff in the system, enabling her to clock in and begin work. (Def.'s 56.1 ¶ 86.)

The plaintiff arrived for work the next day on May 19, 2016, and went to the office to get her schedule for the rest of the week. (*Id.* ¶ 87.) Finkelstein, who did not know about the previous day's interactions about the plaintiff's leave, told the plaintiff that there were no hours available for her that week, because she had been coded on leave when he made the schedule. (*Id.* ¶ 88.) According to the defendant, the plaintiff yelled at Finkelstein, pointed at him "aggressively," and demanded that he put her on the schedule. (*Id.* ¶ 89.) Assistant store managers Tori Mazzola and Kathy Lisi confirmed that the plaintiff raised her voice. (*Id.* ¶ 90.)

Finkelstein explained that he could give the plaintiff one additional day on the schedule, that she would be paid for working on May 18 and 19, but that that week's schedule was otherwise full. (*Id.* ¶ 91.) Because of the plaintiff's "insubordinate and inappropriate conduct," the plaintiff received a third Corrective Action, which was grounds for termination. (*Id.* ¶ 92.)

The third Corrective Action report and termination reads: "On 5/19/16, [the plaintiff] acted in a combative and insubordinate manner toward [her] Store Manager when he was trying to explain that store management had not placed [her] on the schedule that week because they understood that [she] was on a medical leave of absence. [The plaintiff] yelled at the Store Manager, refusing to let him explain, raising [her] voice, demanding to be placed on the schedule, and pointing [her] finger at him aggressively . . . . This conduct falls outside of the Company's expectation that all Associates refrain from Improper Behavior and treat each other with respect." (*Id.* ¶ 95; Benson Decl., Ex. L.) The report included an Action Plan, which provides, "Due to this conduct and [the plaintiff's] prior Corrective

Actions for Improper Behavior, [the plaintiff's] employment will be terminated on June 13, 2015 consistent with the Company's Corrective Action Policy." (Def.'s 56.1 ¶ 96; Benson Decl., Ex. L.)

The plaintiff says that the third Corrective Action report is inaccurate. (Pl.'s 56.1 ¶¶ 77, 92.) According to the plaintiff, HR XPRESS informed the store on May 11, 2016, that the plaintiff was not on a medical leave of absence. (*Id.* ¶ 84.) She returned to the store to work on May 18, 2016, spoke with Kevin Carter, the assistant store manager who was in charge of scheduling, and he put her on the schedule for the following week. (*Id.* ¶ 88; Pl.'s Dep. 221, 227-31.)

The plaintiff spoke with assistant store manager Tori Mazzola on May 19, and together they called HR XPRESS, and told them that the plaintiff could not punch in. (Pl.'s 56.1 ¶¶ 85-86; *see also* ECF No. 57-1 at 16.) HR XPRESS processed the plaintiff's return to work that morning. (Pl.'s 56.1 ¶ 93; *see also* ECF No. 57-1 at 16.)

Finkelstein called HR XPRESS about an hour later, and told them that Jessica Puerta had advised that the store put the plaintiff on a personal leave of absence, which did not require any paperwork. (Pl.'s 56.1 ¶¶ 88, 94.) Later, when HR XPRESS received the necessary paperwork, the plaintiff's leave was changed to FMLA leave. (*Id.* ¶ 93.)

According to the plaintiff, Finkelstein asked her why she was at the store, and they argued about the following week's schedule. (*Id.* ¶¶ 87-89.) Finkelstein wanted to remove the plaintiff from the following week's schedule. (Pl.'s Dep. 236:8-23.) The plaintiff accused Finkelstein of discriminating against her, and threatened to report him. (Pl.'s 56.1 ¶ 89.) The plaintiff raised her voice—but it was not loud—and pointed at the ceiling, not at Finkelstein. (*Id.*; Pl.'s Dep. 189:21-23, 236:13-237:14.) Mazzola and Lisi witnessed the conversation. (Pl.'s 56.1 ¶ 90.)

Finkelstein did not give the Corrective Action or termination to the plaintiff that day. (*Id.* ¶ 93.) The next day, May 20, 2016, the plaintiff asked HR XPRESS for FMLA leave starting the previous day. (*Id.*)

The initial conference in this case took place on June 3, 2016, while the plaintiff was on leave. At the conference, the plaintiff, who was at that point representing herself, discussed a psychiatrist's note filed on the docket, stating that she was a "victim of verbal and psychological abuse by her managers." (*See* ECF No. 14.) The plaintiff claims that it was only after this conference that the defendant decided to fire her. (Pl.'s 56.1 ¶ 93.) She also cites the date of the Corrective Action—June 15, 2016—to refute the defendant's claim that Finkelstein could not deliver the third Corrective Action until she returned from FMLA leave. (*Id.*) When she returned to work on June 15, 2016, Finkelstein gave her the Corrective Action and terminated her. (*Id.* ¶ 95.)

The plaintiff says that the defendant's progressive discipline policy typically runs the following course: (1) formal counseling, (2) first warning, (3) second warning, and (4) termination, and contends that store management makes decisions about discipline and termination. (*Id.* ¶¶ 119-21.) The plaintiff contends that the defendant fired her on the third step, rather than the fourth step. She notes that the final Corrective Action form refers to a "tardiness" written warning, but that that warning did not play a role in the progressive discipline. (*Id.* ¶ 131.)

Finkelstein testified that Human Resources made all the decisions to discipline the plaintiff, including the termination decision. (*Id.* ¶ 127.) Jessica Puerta, the Human Resources Generalist, testified that either Finkelstein or the district manager prepared the first discipline report. (*Id.* ¶ 128.) She did not know how the decision to terminate the plaintiff was made, but thought Gail Parker was involved. (*Id.*) Gail Parker testified that store management makes all discipline and termination

decisions, that Human Resources' role is a "consulting" one, and that she had no role in the termination decision.  (*Id.* ¶¶ 126, 129.)

**2. Procedural History**

The plaintiff commenced this action on February 22, 2016, asserting Title VII and ADA claims for discrimination on the basis of disability, gender/sex, and religion, failure to promote, failure to accommodate, retaliation, and harassment, and an Equal Pay Act claim for unequal pay.  (ECF No. 1.) The parties completed discovery in December of 2017.  The defendant moved for summary judgment on April 17, 2018.  (ECF No. 48.)  In the plaintiff's opposition, she confirmed that she dropped her Title VII and ADA claims for discrimination on the basis of gender/sex and religion, failure to promote, failure to accommodate, and harassment, as well as her Equal Pay Act claim.  (ECF No. 56 at 10.)

**LEGAL STANDARD**

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The movant has the "burden of showing the absence of any genuine dispute as to a material fact."  *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 453-54 (S.D.N.Y. 2012) ("While disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted.") quoting *Anderson*, 477 U.S. at 248)).  "Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial."  *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986)). The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). In deciding whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008). Because the defendant is moving for summary judgment, I draw all reasonable inferences in the plaintiff's favor.

In deciding a summary judgment motion, I need only consider evidence that would be admissible at trial. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).

## DISCUSSION

The defendant argues that the plaintiff's claims for disability discrimination and retaliation under the ADA should be dismissed.

### 1. Disability Discrimination Claim

The Americans With Disabilities Act prohibits an employer from discriminating against a qualified employee on the basis of disability. 42 U.S.C. § 12112(a). Discrimination claims under the ADA are analyzed under the *McDonnell Douglas* burden-shifting framework. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Under this framework, the plaintiff must "first establish a *prima facie* case of discrimination under the ADA, after which the burden of proof shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the'" defendant's conduct. *Fox v. Costco Wholesale Corp.*, 918 F.3d 65 (2d Cir. 2019) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant meets its burden, the plaintiff must then "demonstrate that [the defendant's] assigned reason . . . was a pretext or discriminatory in its application." *McDonnell Douglas*, 411 U.S. at 807.

14

a. *Prima Facie Case*

To establish a *prima facie* case of discrimination under the ADA, the plaintiff must show that (1) the defendant is subject to the ADA, (2) the plaintiff was disabled within the meaning of the ADA, (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation, and (4) the plaintiff suffered an adverse employment action on the basis of her disability. *Sista*, 445 F.3d at 169. The last element requires the plaintiff to "show that the adverse employment action 'took place under circumstances giving rise to an inference of discrimination.'" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). The plaintiff's burden of establishing a *prima facie* case is "*de minimis.*" *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). The parties agree that the defendant is subject to the ADA, that the plaintiff is disabled within the meaning of the ADA, that the plaintiff was qualified to perform the essential functions of her job, and that the plaintiff suffered an adverse employment action. Thus, the only element at issue is whether the plaintiff was terminated because of her disability.

The plaintiff can establish the fourth element of the *prima facie* discrimination case by demonstrating that the sequence of events leading up to her termination raises an inference of discrimination, *see Bass v. Chem. Banking Corp.*, No. 94-CV-8833, 1996 WL 374151, at *6 (S.D.N.Y. July 2, 1996), or by providing proof of "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Karatzas v. Herricks Union Free Sch. Dist.*, No. 15-CV-2888, 2017 WL 3084409, at *15 (E.D.N.Y. July 18, 2017); *see also Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) ("The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a

discriminatory animus," as well as the "timing or sequence of events leading to the plaintiff's termination.").

The evidence of Finkelstein's interactions with the plaintiff, while not overwhelming, could lead a reasonable person to infer that the sequence of events leading up to the plaintiff's termination was motivated by disability discrimination. The plaintiff received her first Corrective Action after she told Finkelstein that she had a disability. Finkelstein issued the Corrective Action because of the "pizza incident," but that happened before Finkelstein started working at the store. The store manager who was there at the time reviewed the incident, and did not think it warranted discipline. The plaintiff also alleges that Finkelstein verbally abused her, routinely belittled her mental capacity, and disparaged her disability, an allegation that is supported by Barbara Thomas' declaration that Finkelstein told the plaintiff that "a moron [was] smarter" than the plaintiff. The plaintiff also cites Finkelstein's email in which he pointed out the plaintiff's mistakes: "[S]he told me she contacted H&R (as she refers to them instead of HR)," and "[S]he mentioned she was told by L&P (LP)."

Based on this evidence, the plaintiff satisfies the *de minimis* burden of establishing that her termination took place under circumstances giving rise to an inference of discrimination.

b. *Legitimate, Non-Discriminatory Purpose*

At the second step, the defendant's burden to offer a legitimate, non-discriminatory rationale for the adverse action is "light." *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 176 (E.D.N.Y. 2011) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998)). The defendant must "simply articulate an explanation that, if true, would connote lawful behavior." *Id.* (internal quotation marks omitted).

The defendant satisfies its "light" burden of articulating a legitimate, non-discriminatory rationale. The defendant states that the plaintiff was terminated for repeated insubordination and other

16

inappropriate conduct. This claim is buttressed by the three Corrective Actions the plaintiff received for similar behavior; in each incident, she raised her voice to other employees and managers. After the second Corrective Action, the defendant warned the plaintiff that a third one could be cause for termination. This is sufficient to shift the burden back to the plaintiff to establish that the defendant's rationale was a pretext for disability discrimination.

  c. *Unlawful Discriminatory Pretext*

  At the third and final step, the plaintiff has the burden of showing that the defendant's proffered reason was a pretext for unlawful discrimination. *Treglia*, 313 F.3d at 721. To defeat a summary judgment motion, the plaintiff must "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994) (emphasis in original). In other words, the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The plaintiff "may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013).

  Viewing the evidence in the light most favorable to the plaintiff, a reasonable factfinder could find that the defendant's proffered reasons were a pretext for unlawful discrimination. Almost immediately after he took over the store manager's position, Finkelstein issued the plaintiff's first Corrective Action, after she told him that she had a disability, for an incident that had been reviewed by another store manager who decided that no discipline was warranted. The plaintiff also presented

evidence that Finkelstein routinely belittled her mental capacity and disparaged her disability. Moreover, Finkelstein's testimony that Human Resources made decisions about discipline and termination conflicted with the testimony of the Human Resources personnel, who said that management made those decisions. The plaintiff also disputes the substance of the Corrective Actions, including the claim that she used profanity. When this evidence is viewed in the light most favorable to the plaintiff, there are enough facts to infer that the defendant's reason for her termination was a pretext, and that the defendant terminated her because of her disability.

The defendant argues that the plaintiff's documented history of "insubordination" defeats the plaintiff's claim of pretext. But the plaintiff did not receive a Corrective Action in the approximately four years that she had worked at HomeGoods from 2011 to 2015. It was only after Finkelstein became store manager that she received her first disciplinary action. Thus, her "history" was only with Finkelstein, so it does not defeat her claim that she was disciplined because of her disability.

The defendant also argues that Finkelstein was merely following "managerial protocol" when he wrote the email recounting his conversation with the plaintiff. A reasonable factfinder could conclude that Finkelstein had no reason to mention the plaintiff's mistakes about acronyms, and that he described them only to make fun of her.

Nor does the plaintiff's inability to provide the dates on which Finkelstein made his remarks compel a different result. Finkelstein issued the first two Corrective Actions within two months of becoming store manager at the Staten Island HomeGoods location. He issued the third and final Corrective Action six months later. Given this brief window of time and the evidence that Finkelstein routinely belittled and disparaged the plaintiff because of her disability, a reasonable factfinder could conclude that is enough to establish pretext.

18

## 2. Retaliation Claim

The plaintiff claims that the defendant terminated her after the initial conference was held in this case on June 3, 2016, at which the plaintiff discussed a psychiatrist's statement that she was "victim of verbal and psychological abuse by her managers."[7]

Retaliation claims under the ADA are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Treglia*, 313 F.3d at 719. The plaintiff must first establish a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity protected by the ADA, (2) the defendant was aware of the activity, (3) the defendant took an adverse action against the plaintiff, and (4) there was a causal connection between the adverse action and the protected activity. *Id.* The burden then shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its adverse action. *Id.* at 721. The plaintiff must then "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.* (internal quotation marks omitted).

In establishing a causal connection, "[t]emporal proximity between the protected activity and the adverse employment action 'must be very close.'" *Meyer v. Shulkin*, 722 F. App'x 26, 28 (2d Cir. 2018) (summary order) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

---

[7] The plaintiff does not respond to the defendant's arguments for dismissal of her retaliation claim premised on her EEOC charge and complaints to Human Resources about harassment. In any event, the plaintiff did not present sufficient evidence to establish a *prima facie* retaliation claim based on that protected activity. Accordingly, those claims are also dismissed.

Viewing the evidence in the light most favorable to the plaintiff, no reasonable factfinder could find that the events of the initial conference led to her termination. Although the ultimate adverse employment action—the plaintiff's termination—took place within days of the initial conference, the plaintiff had received Corrective Actions months earlier. Accordingly, the plaintiff's retaliation claim under the ADA is dismissed.

### 3. Motion to Strike

The defendant argues that the plaintiff's counterstatement of facts and the Barbara Thomas witness declaration are improper and should be stricken, because they contain inadmissible statements, and conclusory and irrelevant information.

"Whether to grant or deny a motion to strike is vested in the trial court's sound discretion." *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. 05-CV-776, 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 14, 2007) (citing *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)). Motions to strike are "generally disfavor[ed]," and moving parties bear a heavy burden. *Id.* In deciding a motion to strike, courts "use a scalpel, not a butcher knife." *Id.* (internal quotation marks omitted).

In this case, there is no need to strike anything from the parties' submissions, for the simple reason that I have disregarded any statements that are not factual, as well as any inadmissible evidence. *See Trustees of Local 8A-28A Welfare Fund v. Am. Grp. Administrators*, No. 14-CV-1088, 2017 WL 3700899, at *3 (E.D.N.Y. Aug. 25, 2017) (disregarding non-factual statements in plaintiff's Rule 56.1 statement and aspects of a supporting affidavit not based on personal knowledge or otherwise admissible). As for Barbara Thomas, she is a former employee, and has personal knowledge of Finkelstein's behavior toward the plaintiff. The plaintiff identified her as a witness, but the defendant did not depose her or ask the plaintiff about her at the plaintiff's deposition. Thus, the plaintiffs were not "sandbagged" by the evidence of her observations.

Accordingly, the defendant's motion to strike is denied.

## CONCLUSION

The defendant's motion for summary judgment is denied with respect to the plaintiff's disability discrimination claim, and granted with respect to the plaintiff's retaliation claim. Accordingly, the plaintiff's retaliation claim is dismissed. The defendant's motion to strike is denied.

**SO ORDERED.**

/s Ann M. Donnelly

The Honorable Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
March 29, 2019